**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| DEBORAH SELMAN, | ) | |
| | ) | CASE NO.  1:13CV2556 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff Deborah Selman ("Selman") challenges the final decision of the Acting Commissioner of Social Security, Carolyn W. Colvin ("Commissioner"), denying her claim for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq.*  This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is VACATED and the case REMANDED for further proceedings consistent with this Opinion.

## I.  Procedural History

On February 3, 2010, Selman filed an application for POD, DIB, and SSI alleging a disability onset date of May 20, 2009 and claiming she was disabled due to fibromyalgia, spinal stenosis, sciatica, depression, and, chronic obstructive pulmonary disease ("COPD").  (Tr. 79, 99, 104.)  She later claimed she was also disabled due to brachial neuritis and tendonitis.  (Tr. 158.)  Her application was denied both initially and upon reconsideration.  (Tr. 49-54, 57- 61.)  Selman timely requested an administrative hearing. (Tr. 65.)

On August 3, 2012, an Administrative Law Judge ("ALJ") held a hearing during which Selman, represented by counsel; a medical expert ("ME"); and, an impartial vocational expert ("VE") testified.  (Tr.  26-44.)  On August 24, 2012, the ALJ found Selman was able to perform her past relevant work and, therefore, was not disabled.  (Tr. 8-20.)  The ALJ's decision became final when the Appeals Council denied further review.  (Tr. 1-3.)

## II.  Evidence

*Personal and Vocational Evidence*

Age fifty-five (55) at the time of her administrative hearing, Selman is a "person of advanced age" under social security regulations.  (Tr. 31.)  *See* 20 C.F.R. § 404.1563(e) & 416.963(e).  Selman completed the eighth grade and later received a GED.  (Tr.  32, 105.)  She has past relevant work as a customer service representative and collections agent.  (Tr. 30, 106, 116-123.)

*Medical Evidence*

On March 2, 2009, Selman presented to her primary care physician Jaya Unnithan, M.D., with complaints of neck, shoulder, wrist, and elbow pain.  (Tr. 243-245.)  A cervical x-ray taken

2

that day showed (1) diffuse osteopenia with severe disc space narrowing at C5-6; (2) mild disc space narrowing at C6-7; (3) mild degenerative endplate changes; (4) diffuse degenerative facet changes; and, (5) mild smooth reversal of the normal cervical lordosis within the lower cervical spine.  (Tr. 251.)  Dr. Unnithan diagnosed cervicalgia, and recommended physical therapy.  (Tr. 244.)

Selman began physical therapy in March 2009.  (Tr. 828-832.)  At her first visit, she reported constant neck pain that radiated into her arm and elbow. (Tr. 828.)  She also reported numbness in her right forearm, hand cramping, and difficulty raising her left arm.  *Id*.  The physical therapist, Maighdlin Bauman, P.T.,  noted decreased cervical left rotation range of motion; positive dural signs on the left; and, hyperreflexia on the left indicating possible upper motor neural involvement.  (Tr. 831.)  She also noted decreased left shoulder range of motion. *Id*.

Selman returned to Dr. Unnithan in April and June 2009 with continued complaints of neck and shoulder pain, as well as pain in her right knee and hip.  (Tr. 232-233, 220-222.)  Dr. Unnithan noted tenderness to palpation and painful restriction in both shoulders.  (Tr. 215, 222.) She continued Selman on her pain medications (including Percocet); added Tramadol; and, recommended continued physical therapy.  (Tr. 215-216.)  Selman completed twelve physical therapy sessions in April, July, and August 2009.  (Tr. 787-827.)

Selman presented to pain management specialist Marc Soloman, M.D., on December 17, 2009.  (Tr. 195-199.)  She reported experiencing lower back, neck and shoulder pain for ten years and "describe[d] the location of the pain as all over joint pain."  (Tr. 196.)  She stated her pain was "chronic, aching and rated as 6 on a scale of 1-10, with radiation."  (Tr. 196.)  On

3

examination, Dr. Soloman noted Selman was hyperreflexic in her lower extremities and exhibited ten tender points as well as sleep disturbance.  (Tr. 199.)  He diagnosed fibromyalgia; prescribed Cymbalta; and, ordered a cervical MRI.  *Id.*  The MRI, conducted on December 29, 2009, showed "moderate cervical spondylosis . . . most significant at C5-6 where diffuse disk osteophyte complex causes moderate central canal narrowing and has mass effect on the ventral cord."  (Tr. 202-203.)

Selman returned to Dr. Soloman in January 2010 with continued complaints of neck, shoulder, back and joint pain.  (Tr. 191-193.)  Dr. Soloman diagnosed fibromyalgia and cervicalgia.  (Tr. 193.)  He prescribed Lyrica, and referred Selman to neurosurgeon Samuel R. Borsellino for consultation regarding her lower extremity hyperreflexia.  (Tr. 192.)  The following month, Selman presented to Dr. Borsellino and reported that "her pain has been there for 10 years and is constant whether she is moving or not." (Tr. 175-177.)  Dr. Borsellino noted the above MRI findings and recommended continued conservative therapy.  (Tr. 176.)

Selman presented to Dr. Soloman in March 2010 with complaints of daily, worsening right hand pain.  (Tr. 189-190.)  Dr. Soloman assessed arthritic pain; ordered a wrist band; prescribed Voltaren; and, referred her for an orthopedic consultation.  (Tr. 190.)  Selman thereafter presented to orthopedist Paul Treuhaft, M.D., on April 19, 2010.  (Tr. 349-351.)  She reported that she "has extensive fibromyalgia that bothers her all over" and  "pain virtually everywhere in her body."  (Tr. 350.)  Dr. Treuhaft determined she had full range of motion in all of her fingers and normal strength.  *Id*.  He assessed diffuse hand pain related to her

4

fibromyalgia.[1]  *Id.*

On April 16, 2010, Selman presented to Dr. Soloman for a follow-up regarding her fibromyalgia pain.  (Tr. 352-354.)  She reported daily pain "all over [her] body," which she rated a 10 on a scale of 10 and described as "sharp, stabbing, and shooting all over the body from head to toe."  (Tr. 353.)  Dr. Soloman increased her Lyrica dosage and recommended sacro-iliac ("SI") injections.  (Tr. 353.)  Selman thereafter underwent SI injections in April and May 2010. (Tr. 344, 346.)  She returned to Dr. Soloman on May 27, 2010 and reported only temporary relief (1-2 days) from the injections.  (Tr. 341-342.)  She complained of daily, aching pain in her neck, back and left shoulder.  (Tr. 341.)  Dr. Soloman diagnosed fibromyalgia; cervicalgia; sacro-iliac pain; and facet arthropathy.  (Tr. 342.)  He advised Selman to continue with her pain medication and recommended a dorsal sacral nerve root radiofrequency ablation ("RFA").  *Id.*

Selman underwent the RFA on June 21, 2010.  (Tr. 338-339.)  In a subsequent visit with Dr. Soloman in August 2010, she reported 20% relief from the RFA, but continued to complain of neck and lower back pain as well as tremors and spasms.  (Tr. 327-329.)  At this visit, Selman apparently complained she was not happy with the care she had received from Dr. Soloman.  (Tr. 328.)  Dr. Soloman's notes indicate he explained to Selman that he would not prescribe narcotics for her fibromyalgia, as studies had shown them to be not effective for that condition.  *Id.* Instead, Dr. Soloman ordered a cervical MRI, which Selman underwent on August 19, 2010.

---

[1] On April 1, 2010, state agency physician Myung Cho, M.D., reviewed Selman's records and completed a Physical RFC assessment.  (Tr. 280-287.)  She concluded that Selman was capable of lifting 50 pounds occasionally and 25 frequently; standing and/or walking for a total of 6 hours in an 8 hour work day; and, sitting for about 6 hours in an 8 hour work day.  (Tr. 281.) Dr. Cho further opined that Selman had unlimited push/pull capacity and had no manipulative limitations.  (Tr. 281-283.)  She did find, however, that Selman could never climb ladders, ropes, or scaffolds.  (Tr. 282.)

(Tr. 465.)  This MRI revealed spondylosis resulting in moderate right foraminal encroachment at C5-6 and mild ventral cord deformity.  *Id.*

Meanwhile, Selman presented to Dr. Unnithan in July and August 2010 with complaints of nighttime muscle spasms during which "her whole body jerks, including legs, trunk and arms."  (Tr. 334.)  Dr. Unnithan increased her dosage of Baclofen; prescribed Clonazepam; and, referred Selman for a neurology consult.  (Tr. 336.)  On August 3, 2010, Selman presented to neurologist C. Daniel Ansevin, M.D.  (Tr. 309-313.)  She reported repetitive left arm spasm; weakness in her left hand; chronic neck pain and "shock like pains in the neck region with neck flexion or extension;" and, a "vague sense of clumsiness for the past few months but no falls."  (Tr. 309.)  On examination, Dr. Ansevin found some reduced grip strength and "diffuse hyperreflexi[a] in the upper extremities and lower extremities bilaterally with crossed adduction at the knees bilaterally but downgoing toes bilaterally and 1-2 beats of clonus at the ankles bilaterally."  (Tr. 311.)  He also found positive Hoffman sign bilaterally, and positive Romberg testing "but she catches herself."[2]  *Id.*  Dr. Ansevin advised Selman to continue with Baclofen and referred her to a spinal neurosurgeon.  (Tr. 312.)

On August 31, 2010, Selman presented to neurosurgeon William E. Bingaman, M.D. (Tr. 513-517.)  She complained of neck, left shoulder, and lower back pain; tremors in her arms and legs; difficulty with hand writing; and, problems with balance.  (Tr. 513.)  Dr. Bingaman observed normal muscle tone and strength, but noted two point sensory discrimination (right

---

[2] The Hoffman sign is defined as "increased excitability to electrical stimulation in the sensory nerves; the ulnar nerve is usually tested." Dorland's Illustrated Medical Dictionary, 32nd ed. (2012), at 1430.  Romberg's sign is "swaying of the body or falling when standing with the feet close together and the eyes closed; the result of loss of joint position sense, seen in tabes dorsalis and other diseases affecting the posterior columns." *Id.* at 1715.

6

greater than left); hyperreflexic lower extremity responses; "mild sway to the right on Romberg;" and "difficulty with tandem walk; drifts to the left."  (Tr. 514.)  He recommended Selman undergo an anterior cervical diskectomy, although he noted that it might not correct all of her symptoms as "she may have an underlying sleep disorder."  (Tr. 515.)

On September 3, 2010, Selman returned to Dr. Ansevin with complaints of exacerbation of spasms and worsening neck pain.  (Tr. 470.)  On examination, Dr. Ansevin observed diffuse hyperreflexia in both the upper and lower bilateral extremities; positive bilateral Hoffman signs; and "Romberg testing positive but she catches herself."  (Tr. 471.)  His notes indicate that he "doubt[ed] that the spasm will resolve with surgical decompression of the spine and I did explain this clearly to" Selman.  (Tr. 472.)  However, he noted that Selman "complains of intolerable neck pain and wants to proceed with the surgery despite my clear explanation that it may not improve this symptom either, and could even make the pain worse."  *Id*.  On September 13, 2010, Dr. Bingaman performed a C5-C6 anterior cervical diskectomy, allograft fusion, and anterior cervical plating.  (Tr. 489-490.)

Selman thereafter completed a course of physical therapy from November 16, 2010 through December 23, 2010.  (Tr. 616-664.)  At her initial evaluation, Selman reported continued neck pain despite the surgery.  (Tr. 657.)  She also complained of left shoulder and back pain, as well as tremors in her upper body, and stated her pain interfered with her sleep and daily functioning.  (Tr. 657, 661.)  The physical therapist noted decreased left shoulder range of motion; decreased shoulder and cervical strength; joint hypomobility; and decreased positional tolerance.  (Tr. 661.)  The record reflects Selman generally reported temporary improvement with therapy, but a return of symptoms the day following a therapy session.  (Tr. 633, 616.)  At

her final session, the physical therapist noted that Selman's shoulder range of motion and strength was "much improved," but stated "she continues to have some cervical pain and pain with prolonged sitting for which she continues to see pain management." (Tr. 617.)

Selman also returned to Dr. Soloman in November and December 2010. (Tr. 592-593, 597-598.) She continued to report pain in her hip, knee, lower back, and left shoulder. *Id*. Selman stated that her pain medications (Vicodin and Lyrica) had helped, but that she had experienced little relief from physical therapy. (Tr. 593, 598.) Dr. Soloman recommended an MRI of her left shoulder, which Selman underwent on January 3, 2011. (Tr. 833-834.) This MRI revealed rotator cuff tendinosis; mild degenerative arthritis in the acromioclavicular joint; and, degenerative changes in the superior labrum. (Tr. 833.)

Dr. Soloman then referred Selman to orthopedic specialist Frank M. Sabo, M.D., for evaluation of her left shoulder pain. (Tr. 611-612.) On January 18, 2011, Dr. Sabo noted that Selman "complains of diffuse shoulder pain. She has pain just sitting still. She has pain touching the shoulder. She has pain reaching up as well as in certain directions. She describes it as a sharp pain as well as an aching pain and burning pain." (Tr. 611.) Examination of Selman's shoulder revealed tenderness along the trapezius, rhomboid and parascapular musculature and anterolateral shoulder. (Tr. 612.) Dr. Sabo assessed "left shoulder pain likely multifactorial in origin," and left rotator cuff tendonitis. *Id*. He recommended against surgery, and opined that Selman's fibromyalgia and possible radicular symptoms "may be contributing to the majority of her pain." *Id*. Dr. Sabo gave Selman a cortisone injection, and suggested she follow up with a

8

neurosurgeon "since her symptomatology is worse than before surgery."[3] *Id.*

Selman returned to Dr. Sabo on March 1, 2011 and indicated the cortisone injection had helped "about 10%." (Tr. 693.) Dr. Sabo did not believe that all of Selman's symptoms were originating from her shoulder and felt that surgery was not advisable. (Tr. 693-694.) He acknowledged that Selman had "seen multiple physicians and nobody seems to have a good answer." (Tr. 693.) Since nothing else had seemed to work, Dr. Sabo recommended Selman try acupuncture, massage and "some alternative type modalities." (Tr. 694.)

Selman then presented to Leo Simoson, D.C., for four chiropractic treatments in March 2011. (Tr. 676-692.) Dr. Simoson repeatedly noted that Selman's "active and passive range of motion measurements in the cervical and lumbar spines were restricted to a marked degree, with pain and spasm." (Tr. 676, 684, 689.) In addition, he observed that palpatory inspections of Selman's cervical, thoracic and lumbar spines revealed fixations, hypertonic musculature, pain, and trigger points. (Tr. 676, 680, 684, 689.)

On March 3, 2011, Selman presented to Dr. Soloman for follow up regarding her ongoing complaints of hip, neck and back pain, and fibromyalgia. (Tr. 915-917.) She rated her pain a 7 on a scale of 10, and described it as "aching and tenderness, stabbing-drilling type pain, duration to the present time occurring daily." (Tr. 915.) Dr. Soloman recommended a trochanteric bursa

---

[3] On January 23, 2011, state agency physician Leon Hughes, M.D. reviewed Selman's records and completed a Physical RFC Assessment. (Tr. 668-675.) He opined Selman could lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 6 hours in an 8 hour workday; and, sit for about 6 hours in an 8 hour workday. (Tr. 669.) Dr. Hughes further offered that Selman had limited push/pull capacity in her upper extremities and could only occasionally stoop, kneel, crouch, crawl or climb ladders, ropes, and scaffolds. (Tr. 669-670.) He also concluded Selman was limited to occasional bilateral overhead reaching, and should avoid concentrated exposure to unprotected heights and hazards. (Tr. 671-672.)

block procedure, which Selman underwent on March 14, 2011.  (Tr. 909.)  The following month, Selman returned to Dr. Soloman and reported that the bursa block had provided 60% relief on the right side and 50% relief on the left side. (Tr. 935.)

In July 2011, however, Selman complained that the pain had come back.  (Tr. 961.)  She rated her pain a 9 on a scale of 10 and described it as sharp, deep, and occurring daily.  (Tr. 959.)  Selman received a left upper trapezius trigger point injection that day, and underwent a second bilateral trochanteric bursa block procedure later that month.  (Tr. 961, 947, 953.)

On August 19, 2011, Selman presented to pain management specialist Benjamin Abraham, M.D.  (Tr. 977-979.)  Although she reported 80% relief from second bursa block procedure, she also complained of constant pain in her neck and shoulder which she rated a 5 on a scale of 10.  (Tr. 977.)  On examination, Dr. Abraham noted restricted range of motion of Selman's neck; pain to palpation over the cervical paraspinal muscles; tenderness to palpation over the left trapezius; and, antalgic gait.  (Tr. 979.)  He concluded that Selman's "worsening restriction of neck motion likely due to worsening facet arthropathy."  *Id*.  He diagnosed facet arthropathy and fibromyalgia and scheduled Selman for a left C-3,4,5 cervical facet medial branch nerve block.  *Id.*  Selman subsequently underwent nerve blocks on August 29, 2011 and October 3, 2011.  (Tr. 969-971, 995-997.)  In addition, Dr. Abraham administered a left C-3,4,5 cervical facet medial branch nerve RFA on October 24, 2011.  (Tr. 873-877.)

In December 2011, Selman presented to rheumatologist Feyrouz Al Ashkar, M.D., for evaluation of her knee pain.  (Tr. 845-859.)  On examination, Dr. Al Ashkar assessed full range of motion in Selman's shoulders; negative straight leg raising; no instability in any upper or lower extremity joints; and, normal gait.  (Tr. 851.)  However, he also noted 12 tender points and

diffuse soft tissue tenderness.  *Id*.  Dr. Al Ashkar diagnosed fibromyalgia; bilateral knee pain; cervicalgia; muscle spasm; and, vitamin D deficiency.  *Id.*  He found no evidence of systemic inflammatory rheumatic disease, and recommended Selman continue to follow up with pain management regarding her fibromyalgia symptoms.  (Tr. 852.)

Also in December 2011, Selman returned to Dr. Abraham with complaints of pain in her knees, left shoulder, neck, and lower back.  (Tr. 1005-1007.)  Selman reported 40% relief from the October 2011 RFA but indicated that she was still experiencing pain, particularly when she was on her feet for more than an hour.  (Tr. 1005.)  Dr. Abraham assessed pain to palpation over Selman's cervical and lumbar paraspinal muscles; antalgic gait; and, "tenderness in trigger areas."  (Tr. 1007.)  He recommended she continue her medications (Baclofen, Vicodin, Lyrica, and Cymbalta) and participate in yoga twice per week.  *Id*.

In February 2012, Selman presented to Dr. Abraham with complaints of increased pain in her back and hip, which she rated a 6 on a scale of 10 and described as "worse when walking." (Tr. 1035.)  Dr. Abraham observed pain to palpation in Selman's lumbar paraspinal muscles; positive facet loading bilaterally; and, antalgic gait.  (Tr. 1037.)  He administered a right greater trochanter bursal steroid injection and then, three days later, another lumbar medial branch nerve RFA.  (Tr. 1037, 1027.)  The following month, Selman reported 90% relief from the RFA for one week and "then the pain started to come back."  (Tr. 1047.)  She rated it a 9 on a scale of 10 and described it as worse with any type of activity that requires bending or lifting.  *Id.* Examination findings again included pain to palpation in Selman's lumbar paraspinal muscles; positive facet loading bilaterally; and, antalgic gait.  (Tr. 1049.)   Selman was advised to continue her medications and to try aquatherapy with deep-tissue massage.  *Id*.

11

In May 2012, Selman returned to Dr. Abraham with complaints of aching, burning, stabbing pain in her right lower extremity, foot, lumbar parapinal muscles, and right hip.  (Tr. 1087.)  Dr. Abraham again found pain to palpation in Selman's lumbar paraspinal muscles; positive facet loading bilaterally; and, antalgic gait.  (Tr. 1087-1088.)  He noted that Selman's pain "was only somewhat improved after medial branch RFA" and administered a right greater trochanteric bursa injection.  (Tr. 1088.)

Finally, Selman returned to the pain clinic in June 2012 with complaints of constant, aching neck and shoulder pain, as well as left arm tingling and weakness.  (Tr. 1092.) Examination revealed pain to palpation over the cervical and lumbar paraspinal muscles; positive bilateral Spurling test; positive straight leg raising in the right lower extremity; positive facet loading bilaterally; and, antalgic gait.  (Tr. 1093.)  Selman was advised to continue her medications and home exercise program/aquatherapy; and was scheduled for another left C-3,4,5 cervical facet medical branch nerve RFA.  *Id.*

### Hearing Testimony

At the August 3, 2012 hearing, Selman testified to the following:

- She left high school after the eighth grade. She earned a GED and has taken some college classes.  She is divorced with two grown children.  She lives in an apartment with a roommate.  (Tr. 31-32.)

- She last worked in June 2009.  Her employer let her go because she was not able to do her job due to her pain.  She was unable to sit at her desk for more than 15 to 20 minutes and was calling off work too often because of pain.  (Tr. 32.)

- She cannot work anymore "because of all the pain [she] endure[s]." (Tr. 33.)  She experiences daily pain in her neck, lower back, shoulders, hips, and knees.  (Tr. 33, 36-37.)  Her hands hurt and tingle.  She drops things easily and "loses control" of her fingers.  (Tr. 33-34.)  Her condition has remained the same over the past year.  (Tr. 34.)

12

- She has difficulty sitting for long periods of time because of her neck, shoulder, lower back, and hip pain.  She can sit for approximately 15 to 20 minutes before needing to change positions.  She can stand for 20 to 25 minutes before needing to sit down and rest.  She can walk for "maybe a block."  She can lift a gallon of milk but it hurts her hands.  (Tr. 33, 35-37.)

- Reaching above her head is "extremely difficult" for her and causes "pain shooting down the side of my face, my neck, all the way down my arm, my lower back."  (Tr. 36.)  She can open a door with a doorknob and use buttons and zippers.  However, it is a challenge for her to twist off a jar lid.  She uses the computer on occasion to pay bills.  She cannot really type because she loses control of her fingers.  (Tr. 34.)

- She can do "very little housework."  (Tr. 35.)  She vacuums and does laundry, but it is difficult for her.  She can take a shower and get dressed independently.  She goes grocery shopping every two weeks, but someone generally comes with her to help carry the bags.  She can get around the grocery store "as long as [she] walk[s] at [her] own pace."  (Tr. 35.)

- She has a drivers license.  She can drive but it is difficult to hold on to the steering wheel because her hands tingle and "they just release things."  (Tr. 32.)  In addition, it is painful for her to drive for more than 20 minutes.  (Tr. 32.)

- She takes Vicodin, Lyrica and Cymbalta.  (Tr. 33-34.)

The VE testified that Selman has past relevant work as a customer service representative (light, semi-skilled, SVP 4) and collections agent (sedentary, semi-skilled, SVP 4).  (Tr. 30.)

The ALJ then posed the following hypothetical:

Assume an individual of Claimant's age, education and work experience and assume further I were to find from the medical evidence that the Claimant could do the entire universe of exertional and non-exertional work with the exception that she could lift 20 pounds occasionally, ten pounds frequently, stand and walk six out of eight hours and sit six out of eight hours, perform no ladders, ropes, or scaffolds, perform the postural occasionally, occasional reaching bilaterally above the shoulder level and, what else, no unprotected heights and dangerous moving machinery.  Would she be able to return to her past relevant work?

(Tr. 39.)  The VE testified such a hypothetical individual would be able to perform Selman's past relevant work.  *Id.*

13

The ALJ then posed a second hypothetical that was the same as the first but limited the individual to occasional handling.  (Tr. 39.)  The VE testified such an individual would not be able to perform Selman's past relevant work, but could perform the jobs of usher and hostess/greeter.  (Tr. 39-40.)   The ALJ then asked whether the usher and hostess/greeter jobs would be available if the individual were limited to bilateral handling and fingering at the occasional level.  (Tr. 40.)  The VE testified that the usher and hostess/greeter jobs would be available with this limitation.  *Id.*

The ALJ then posed a third hypothetical that was the same as the first but at the sedentary level.  (Tr. 40.)  The VE testified such an individual could perform Selman's past work as a collections agent, but not her customer service representative work.  (Tr. 40-41.)  The VE further indicated, however, that adding the limitation of occasional handling at the sedentary level would eliminate all jobs.[4]  (Tr. 41.)

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[5]

---

[4]  The ME, Mark Oberlander, Ph.D., testified regarding Selman's psychiatric impairments and concluded that "from a psychiatric standpoint, certainly, the level of [Selman's] impairment is not severe." (Tr. 38.)

[5]  The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe impairment."  A "severe impairment" is one which "significantly limits ... physical or mental

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and, (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Selman was insured on her alleged disability onset date, May 20, 2009, and remained insured through September 30, 2011.  (Tr. 8.)  Therefore, in order to be entitled to POD and DIB, Selman must establish a continuous twelve month period of disability commencing between those dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

### IV.  Summary of Commissioner's Decision

The ALJ found Selman established medically determinable, severe impairments, due to

---

ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled.  For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

cervical degenerative disc disease, left shoulder tendonitis, and fibromyalgia;[6] however, her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 10-14.) Selman was determined to have a Residual Functional Capacity ("RFC") for a limited range of light work. (Tr. 14-19.) The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Selman was capable of performing her past relevant work and, therefore, not disabled. (Tr. 19-20.)

### V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also*

---

[6] The ALJ also found that Selman had the following non-severe impairments: asthma, bladder spasms, a vitamin D deficiency, a sensitive stomach, a calcium deficiency, hand pain, and depression. (Tr. 11-13.)

16

*Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.  *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9,

17

2010).

## VI. Analysis

*Credibility*

Selman first argues the ALJ failed to properly evaluate her fibromyalgia pain and credibility. Specifically, Selman maintains the ALJ's emphasis on the alleged lack of objective medical evidence "demonstrates a misunderstanding of the fibromyalgia diagnosis, which inherently does not produce objective findings or require surgical intervention." (Doc. No. 15 at 18.) Selman also asserts the ALJ "improperly dissected the record" in order to support his conclusion she was not credible, noting in particular that the ALJ cited her reports of obtaining relief from injections but failed to mention that none of those injections provided any long-term relief. Finally, Selman argues that her unsuccessful attempt to return to work and limited daily living activities are also improper reasons for finding her allegations of pain to be less than credible.

The Commissioner argues the ALJ provided numerous reasons to support his credibility finding and, further, that these reasons are supported by the substantial evidence. In particular, the Commissioner notes the ALJ properly relied on examination findings of normal muscle strength, normal gait, and "generally normal ranges of motion," in evaluating her fibromyalgia pain. She also maintains that "Plaintiff's ability to do yoga, ride an exercise bicycle, and perform the exercises required in physical therapy and aquatic therapy, although prescribed by her treating physicians, also suggest that the claimant is not as limited as she alleged." (Doc. No. 17 at 11.)

It is well settled that pain alone, if caused by a medical impairment, may be severe enough

18

to constitute a disability. *See Kirk,* 667 F.2d at 538. When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment. Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms." SSR 96-7p. Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition, and (2) whether the objective medical evidence confirms the alleged severity of pain or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *See Felisky v. Bowen,* 35 F.3d 1027, 1038-39 (6th Cir. 1994).

If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record. *Id.* Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight." SSR 96-7p, Purpose section; *see also Felisky,* 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

19

To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* SSR 96–7p, Purpose. Beyond medical evidence, there are seven factors that the ALJ should consider.[7] The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence. *See Cross v. Comm'r of Soc. Sec.,* 373 F.Supp.2d 724, 733 (N.D. Ohio 2005); *Masch v. Barnhart*, 406 F.Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ accepted that Selman suffered from the severe impairments of cervical degenerative disc disease, left shoulder tendonitis, and fibromyalgia. (Tr. 10-11.) He found that these impairments "more than minimally affect[ed] [Selman's] functional abilities in the workplace." (Tr. 11.) However, the ALJ dismissed Selman's statements concerning the intensity, persistence, and limiting effects of her pain as not credible to the extent they were inconsistent with the RFC.[8] (Tr. 15,18.)

In support of this finding, the ALJ determined as follows:

> [T]he objective medical evidence does not provide a basis for finding limitations greater than those determined in this decision. In addition, consideration of the

---

[7] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. See SSR 96–7p, Introduction.

[8] The ALJ formulated the RFC as follows: "After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she is able to reach above shoulder level bilaterally no more than occasionally, and she is unable to work around dangerous moving machinery or unprotected heights." (Tr. 14.)

factors described in 20 CFR 404.1529(c)(3) and 416.929(c)(3) and Social Security Ruling 96-7p also leads to a conclusion that the claimant's allegations of disabling symptoms and limitations cannot be accepted, and that the residual functional capacity finding in this case is justified.

The claimant's subjective complaints of disabling pain and symptoms are not entirely credible and not fully supported by objective medical evidence and other subjective factors.  A look at the claimant's history shows that she did treat with many orthopedic, neurological, and pain management specialists for many years. She also underwent cervical surgery in the fall of 2010 and had many injections. Still, most of the claimant's clinical findings were relatively benign, she reportedly had a good response to injections, and her treatment was mostly conservative in nature.  In almost all examinations, she had a normal gait, a negative straight-leg raise test bilaterally, full intact reflexes, sensation, pulses, and motor strength, and no atrophy or spasms.  The claimant also reported nearly eighty percent relief from injections administered in the summer of 2011. Following her surgery, she required no hospitalizations and no more operations. Moreover, none of the claimant's treating or examining physicians offered any restrictions on her functional abilities.  The aforementioned factors detract from the credibility of the claimant's allegations that she is unable to perform all work.

Furthermore, the claimant stated that she was a student as recently as May 2010 (1F, 5F).  The claimant was also able to work for about one month after her alleged onset date as a customer service representative (17E).  Additionally, the claimant was able to do yoga on a regular basis as recently as March 2011 (25F). Performing work, taking classes, and doing yoga all presumably require a certain amount of physical abilities including walking, standing, and bending.  The claimant's ability to perform these activities, after her alleged onset date, also make her subjective complaints of disabling impairments and an inability to perform work at any exertional or skill level less persuasive.

Another factor influencing the undersigned's decision is the claimant's description of her daily activities, which are not limited to the extent one would expect, given her complaints of disabling symptoms and limitations.  For instance, the claimant is able to drive short distances, do housework, vacuum, and do laundry.  Although she stated that she has pain from standing for prolonged periods, she is also able to do her own grocery shopping and take care of her personal needs independently.  The claimant's ability to carry out these activities also makes her allegations of disabling impairments less credible.

(Tr. 18.)

The Court finds the ALJ's credibility analysis is not supported by substantial evidence.

The ALJ's primary reasons for discounting Selman's credibility were the lack of objective medical evidence supporting her allegations of disabling pain; "normal" physical examination results; and, the lack of more aggressive treatment.  However, the Sixth Circuit has held that "the absence of objective medical evidence to substantiate the diagnosis of fibromyalgia or its severity is basically irrelevant," in light of the nature of that condition.  *Kalmbach v. Comm'r of Soc. Sec*, 409 Fed. Appx. 852, 864 (6th Cir. 2011).  *See also Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007); *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988).  As that court has explained, fibromyalgia "is a medical condition marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'"  *Rogers*, 486 F.3d at 244, n. 3 (*quoting* Stedman's Medical Dictionary for the Health Professions and Nursing at 541 (5th ed. 2005)).  Diagnosing fibromyalgia involves "observation of the characteristic tenderness in certain focal points, recognition of hallmark symptoms, and 'systematic' elimination of other diagnoses."  *Id.* (*quoting Preston*, 854 F.2d at 820).  CT scans, x-rays, and minor abnormalities "are not highly relevant in diagnosing [fibromyalgia] or its severity."  *Id.*; *see also Preston*, 854 F.2d at 820.  "[P]hysical examinations will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions.  There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion."  *Preston,* 854 F.2d at 818.  *See also Rogers*, 486 F.3d at 244.  As one court explained:

> Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective.  There are no laboratory tests for the presence or severity of fibromyalgia.  The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and--the only symptom that discriminates between it and other diseases of a rheumatic character--multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient

must have at least 11 of them to be diagnosed as having fibromyalgia) that when
pressed firmly cause the patient to flinch. All these symptoms are easy to fake,
although few applicants for disability benefits may yet be aware of the specific
locations that if palpated will cause the patient who really has fibromyalgia to flinch.
There is no serious doubt that [the claimant] is afflicted with the disease but it is
difficult to determine the severity of her condition because of the unavailability of
objective clinical tests. Some people may have such a severe case of fibromyalgia
as to be totally disabled from working, Michael Doherty & Adrian Jones,
"Fibromyalgia Syndrome (ABC of Rheumatology)," 310 British Med. J. 386 (1995);
*Preston v. Secretary of Health & Human Services*, 854 F.2d 815, 818 (6th Cir. 1988)
(*per curiam*), but most do not and the question is whether [claimant] is one of the
minority.

*Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir. 1996).

Here, Selman was diagnosed with fibromyalgia by Drs. Soloman, Abraham, and Al

Ashkar. (Tr. 193, 199, 342, 851, 979.) Treatment notes throughout the medical record reference

Selman's "extensive fibromyalgia" and indicate she consistently exhibited "tenderness in trigger

areas" and, specifically, 12 tender points during an examination in December 2011. (Tr. 851,

350, 612, 676, 680, 684, 689, 1007.) Despite this evidence, the ALJ relied heavily on the lack of

objective medical evidence and "normal" examination results (i.e., normal gait, sensation,

pulses, and motor strength) to discredit Selman's allegations of disabling pain. As noted above,

however, it is clear that the lack of "objective" medical evidence is not unusual, but rather the

norm in fibromyalgia cases. *See Preston*, 854 F.2d at 817-818 (stating that "[t]here are no

objective tests which can conclusively confirm" fibromyalgia); *Keating v. Comm'r of Soc. Sec.*,

2014 WL 1238611 at * 6 (N.D. Ohio March 25, 2014) ("This circuit has recognized that

symptoms of fibromyalgia are often not supportable by objective medical evidence"); *Schlote v.

Astrue*, 2012 WL 1965765 at * 6 (N.D. Ohio May 31, 2012). Similarly, the fact that physical

examinations of Selman's extremities and neurological systems "yielded normal findings" is not

necessarily inconsistent with fibromyalgia. Indeed, the Sixth Circuit has consistently recognized

23

that fibromyalgia patients typically "manifest normal muscle strength and neurological reactions and have a full range of motion." *Kalmbach*, 409 Fed. Appx. at 861-862 (citing *Preston*, 854 F.2d at 820). *See also Minor v. Comm'r of Soc. Sec.,* 513 Fed. Appx. 417, 434 (6th Cir. 2013) (noting fibromyalgia claimants "demonstrate normal muscle strength and neurological reactions and can have a full range of motion"); *Keating*, 2014 WL 1238611 at * 6.

Moreover, the ALJ's determination that Selman lacked credibility because her treatment was "mostly conservative in nature" is also irrelevant in the context of fibromyalgia. Indeed, as the Sixth Circuit has noted, "more 'aggressive' treatment is not recommended for fibromyalgia patients." *Kalmbach*, 409 Fed. Appx. 864. Thus, the fact that Selman "required no hospitalizations and no more operations" after her cervical diskectomy surgery in September 2010 is simply not a relevant consideration in evaluating the credibility of her allegations of disabling pain due to fibromyalgia. As this Court has noted on previous occasions, "[it] is incumbent upon the ALJ to apply the correct standard under existing Sixth Circuit precedent" when evaluating fibromyalgia claims. *Schlote*, 2012 WL 1965765 at * 6. By focusing on the lack of objective medical evidence, neurological examinations showing full strength and range of motion, and the lack of more aggressive treatment, the ALJ failed to properly evaluate Selman's fibromyalgia.

The Court further notes that fibromyalgia was not Selman's only severe impairment. To the contrary, the ALJ also recognized that Selman's cervical degenerative disc disease and left shoulder tendonitis constituted severe impairments. (Tr. 10.) Notwithstanding the ALJ's suggestion to the contrary, the record does contain objective medical evidence substantiating the severity of these particular conditions, including (1) a cervical x-ray taken on March 2, 2009

24

showing severe disc space narrowing at C5-6; (2) a cervical MRI dated December 29, 2009 showing moderate cervical spondylosis most significant at C5-6 where diffuse disk osteophyte complex causes central canal narrowing; (3) a cervical MRI dated August 19, 2010 showing moderate right foraminal encroachment at C5-6; and, (4) a left shoulder MRI dated January 3, 2011 showing rotator cuff tendinosis.  (Tr. 415-416, 202-203, 315, 833.)  Moreover, while the record indicates some normal clinical examination findings, there are also numerous references to hyperreflexia; decreased range of motion; positive bilateral Hoffman sign; positive Romberg testing; two point sensory discrimination; tenderness to palpation over the cervical and lumbar paraspinal muscles; positive facet loading bilaterally; positive bilateral Spurling test; positive straight leg raising in the right lower extremity; and, antalgic gait.  (Tr. 831, 215-222, 199, 311,514, 471, 661, 676, 684, 689, 979, 1007, 1037, 1049, 1087-1088, 1093.)

Moreover, the Court finds the ALJ's reliance on Selman's "reportedly . . . good response to injections," to be misplaced.  While Selman often reported temporary improvement after (some but not all of) her many injections and block procedures, this improvement was invariably temporary in nature.  After these procedures, Selman reported to her doctors that the pain had returned within (at most) a few months, necessitating additional rounds of injections, blocks, and/or RFAs.  (Tr. 341-342, 327-328, 935, 961, 977, 1005, 1047.)  Indeed, in the two year time period between April 2010 and May 2012, Selman underwent at least twelve such procedures. In light of the frequency, Selman's September 2010 cervical diskectomy, and her numerous prescription pain medications, the Court can hardly agree with the ALJ's characterization of Selman's treatment as "mostly conservative in nature."[9] (Tr. 18.)

---

[9] In conducting his credibility analysis, the ALJ also mentioned that "none of the claimant's treating or examining physicians offered any restrictions on her functional abilities." (Tr. 18.)

Finally, the Court disagrees with the ALJ's conclusion that Selman's occasional and infrequent daily activities undermine her allegations of disabling pain. Selman testified she was able to drive short distances, do some limited vacuuming and laundry, dress independently, and go grocery shopping once every two weeks with assistance. (Tr. 32, 35.) The record also contains some evidence that, at her doctor's suggestion, she engaged in yoga twice per week. However, the mere fact that Selman is able to perform these activities in spite of her alleged pain is not necessarily indicative of an ability to perform substantial gainful activity for eight hours a day. *See e.g. Kalmbach,* 409 Fed. Appx. at 864 (finding the claimant's ability to prepare her own meals, dress herself independently, drive short distances and go to the grocery store, pharmacy and church constituted "minimal activities [that] are hardly consistent with eight hours' worth of typical work activities"); *Walston v. Gardner*, 381 F.2d 580, 586 (6th Cir. 1967) ("[t]he fact that [a claimant] can still perform simple functions, such as driving, grocery shopping, dish washing, and floor sweeping does not necessarily indicate that this [claimant] possesses an ability to engage in substantial gainful activity. Such activity is intermittent and not continuous, and is done in spite of pain suffered by [claimant]."); *Hall v. Celebrezze*, 314 F.2d 686, 690 (6th Cir. 1963) ("It was not necessary that [the claimant] be bedridden or wholly helpless in order to establish his claim for benefits.") Moreover, the ALJ's reference to the fact

---

Selman notes, however, that all of her physicians were Cleveland Clinic doctors and that "it is the experience of [Selman's counsel] that [Cleveland Clinic Foundation] physicians traditionally will not complete assessments regarding a patient's ability to perform work-elated activities." (Doc. No. 22 at fn 4.) While the Court has no way of verifying whether the Cleveland Clinic has a policy against its doctors completing functional ability assessments for social security claimants, the Commissioner does not challenge the existence of such a policy. Nor does it direct this Court's attention to any legal authority suggesting it is appropriate for an ALJ to draw a negative inference regarding a claimant's credibility based on the absence of a treating physician opinion.

26

Selman worked for one month after her alleged onset date is misleading in light of her hearing testimony that she was fired from that job because she was unable to sit at her desk for more than 15 to 20 minutes and was calling off work too often due to her pain.  (Tr. 32.)

As the Sixth Circuit has noted, "while credibility determinations regarding subjective complaints rest with the ALJ, those determinations must be reasonable and supported by substantial evidence." *Kalmbach*, 409 Fed. Appx. at 865.  Here, the ALJ's reasons for discrediting Selman's allegations of disabling pain are not supported by substantial evidence.  Accordingly, the Court finds a remand is necessary to allow the ALJ an opportunity to conduct a proper credibility analysis.[10]

### VII.  Decision

For the foregoing reasons, the Court finds the decision of the Commissioner not supported by substantial evidence.  Accordingly, the decision is VACATED and the case is REMANDED, pursuant to 42 U.S.C. § 405(g) sentence four for further proceedings consistent with this opinion.

IT IS SO ORDERED.

<u>/s/ Greg White</u>
U.S. Magistrate Judge

Date: November 17, 2014

---

[10] In the interest of judicial economy, the Court will not address Selman's remaining assignment of error.